**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**TIMOTHY P. O'HARA,**

   **Plaintiff,**

  vs.              **Civ. No. 15-595  KK**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

   **Defendant.**

**MEMORANDUM OPINION AND ORDER[1]**

  **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 12), filed December 28, 2015, in support of Plaintiff Jerome Jaramillo's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title XVI supplemental security income benefits.   On March 4, 2016, Plaintiff filed his Motion to Remand for Rehearing, With Supporting Memorandum ("Motion"). (Doc. 16.)  The Commissioner filed a Response in opposition on June 6, 2016 (Doc. 20), and Plaintiff filed a Reply on June 21, 2016.  (Doc. 21.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 4, 8, 9.)

## I.  Background and Procedural Record

Claimant Timothy P. O'Hara ("Mr. O'Hara") alleges that he became disabled on August 8, 2013, at the age of forty-seven because of post-traumatic stress disorder, borderline personality disorder, anxiety, depression, and Asperger syndrome.  (Tr. 324, 418, 422.[2]) Mr. O'Hara completed two years of college in June 2008, and worked as a pizza delivery driver, pizza assistant manager, semi-truck driver, and bakery delivery driver.  (Tr. 423.)

On October 18, 2013, Mr. O'Hara protectively filed[3] an application for Social Security Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. (Tr. 13, 324-30.)    Mr. O'Hara's application was initially denied on December 31, 2013. (Tr. 127, 128-45, 230-33.)  Mr. O'Hara's application was denied again at reconsideration on April 23, 2014.  (Tr. 146-60, 162, 239-42.)  On May 9, 2014, Mr. O'Hara requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 243.)  The ALJ conducted a hearing on February 11, 2015.  (Tr. 63-92.)  Mr. O'Hara appeared in person at the hearing with his attorney representative Michael Armstrong.  (Tr. 63.)  The ALJ took testimony from Mr. O'Hara (Tr. 69-88) and an impartial vocational expert ("VE"), Leslie J. White.  (Tr. 88-92, 274-75.)

On March 6, 2015, the ALJ issued an unfavorable decision.  (Tr. 10-24.)   In arriving at her decision, the ALJ determined that Mr. O'Hara had not engaged in substantial gainful activity since his alleged disability onset date.  (Tr. 16.)  The ALJ found that Mr. O'Hara suffered from severe impairments of post-traumatic stress and mood disorder, an impulse control disorder, Asperger's syndrome, and obesity.  (*Id.*)  The ALJ also determined that Mr. O'Hara suffered

---

[2] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 12) that was lodged with the Court on December 28, 2015.

[3] Protective Filing Status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security Disability benefits.  The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application.  *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345.

from non-severe impairments of diabetes, sleep apnea, vomiting and diarrhea, arrhythmia, hypertension, and generalized joint pain.   (Tr. 16-17.)   However, the ALJ found that these impairments, individually or in combination, did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 17.)

Because she found that Mr. O'Hara's impairments did not meet a Listing, the ALJ then went on to assess Mr. O'Hara's residual functional capacity ("RFC").   The ALJ stated that

> [a]fter careful consideration of the entire record, I find that claimant has the residual functional capacity to perform sedentary work (occasionally lift 10 pounds, sit for six hours out of an eight-hour work day and stand or walk for two hours out of an eight-hour work day) as defined in 20 CFR 416.967(a) except he cannot kneel, crouch or crawl.   He can carry out simple and some detailed, but no complex tasks.   He can have occasional, superficial interaction with co-workers but cannot interact with the public.

(Tr. 18.)   Based on the RFC and the testimony of the VE, the ALJ concluded that Mr. O'Hara was not capable of performing his past relevant work, but that considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Mr. O'Hara could perform and he was therefore not disabled.   (Tr. 23-24.)

On May 20, 2015, the Appeals Council issued its decision denying Mr. O'Hara's request for review and upholding the ALJ's final decision.   (Tr. 1-3.)   On July 9, 2015, Mr. O'Hara timely filed a Complaint seeking judicial review of the Commissioner's final decision.   (Doc. 1.)

## II. <u>Standard of Review</u>

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision[4] is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence.   42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).

---

[4] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

In making these determinations, the Court must meticulously examine the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo. Sisco v. U.S. Dep't. of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. Substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir. 2004)). Thus, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court would have "made a different choice had the matter been before it *de novo*." *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted). As

such, even if a reviewing court agrees with the Commissioner's ultimate decision to deny benefits, it cannot affirm that decision if the reasons for finding a claimant not disabled were arrived at using incorrect legal standards, or are not articulated with sufficient particularity. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). "[T]he record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Id.* at 1009-10. Rather, the ALJ need only discuss the evidence supporting his decision, along with any "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.*; *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014).

### III. Applicable Law and Sequential Evaluation Process

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). To qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) he is

not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[5] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work."   20 C.F.R. § 416.920(a)(4)(i-iv); *Grogan* 399 F.3d at 1261.   If the claimant can show that his impairment meets or equals a Listing at step three, the claimant is presumed disabled and the analysis stops. If at step three, the claimant's impairment is not equivalent to a listed impairment, before moving on to step four of the analysis, the ALJ must consider all of the relevant medical and other evidence, including all of the claimant's medically determinable impairments whether "severe" or not, and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations.   20 C.F.R. § 416.945(a)(1)-(3).   This is called the claimant's residual functional capacity ("RFC").   20 C.F.R. §§ 416.945(a)(1) & (a)(3).   The claimant's RFC is used at step four to determine if he can perform the physical and mental demands of his past relevant work.   20 C.F.R. §§ 416.920(a)(4), 416.920(e).   If the claimant establishes that he is incapable of meeting those demands, the burden of proof then shifts to the Commissioner, at step five of the sequential evaluation process, to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity ("RFC"), age, education, and work experience.   *Id.*, *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised."   *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359,

---

[5] 20 C.F.R. pt. 404, subpt. P. app. 1.

360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  "This is true despite the presence of counsel."  *Henrie*, 13 F.3d at 361.  "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues."  *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997).  This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination.  *Madrid*, 447 F.3d at 791-92.  The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation."  *Hawkins*, 113 F.3d at 1167.

## IV.  Analysis

Mr. O'Hara asserts two arguments in support of reversing and remanding his case.  First, Mr. O'Hara argues that the ALJ erred by improperly evaluating treating physician Joseph Bergsten, M.D.'s opinion, and ignored certain of Dr. Bergsten's assessed limitations regarding Mr. O'Hara's ability to do work-related physical and non-physical activities.  (Doc. 16 at 17-25.)  Second, Mr. O'Hara argues that the ALJ failed to incorporate into Mr. O'Hara's RFC several of the moderate limitations assessed by State agency non-examining experts Scott R. Walker, M.D., and Cathy Simutis, Ph.D.  (Doc. 16 at 25-26.)   The Court finds grounds for remand as discussed below.

### A.    Relevant Medical Background

The Administrative Record demonstrates that Mr. O'Hara obtained primary medical care from the University of New Mexico Hospital's ("UNMH") Department of Family and Community Medicine from June 16, 2006 to February 10, 2015.  (Tr. 518-29, 572-81, 586-605, 610-18, 625-30, 635-44, 790-92, 797-833, 844-66, 1016-36, 1090-1121.)   Mr. O'Hara saw

various healthcare providers during those nine years[6] and was followed for various medical conditions including, *inter alia*, morbid obesity, hypertension, hypothyroidism, sleep apnea, bilateral knee pain, depression and anxiety.  (*Id.*)

On July 18, 2014, Mr. O'Hara established care with Joseph Bergsten, M.D., House Officer,[7] UNMH Department of Family and Community Medicine.  (Tr. 1102-1106, 1150.) Dr. Bergsten noted that Mr. O'Hara presented to the clinic "to discuss obesity and preparation for bariatric surgery."  (Tr. 1105.)  He further noted that Mr. O'Hara had previously been a patient of Dr. Stuart Lisle,[8] and had recently been seen by Charles Bellows, M.D., and Hamid Hai, M.D., at UNM Sandoval Regional Medical Center who evaluated him for bariatric surgery.[9] (Tr. 1102.)  On physical exam, Dr. Bergsten indicated, *inter alia*, that Mr. O'Hara weighed 165.6 Kg. (365 lbs.).  (Tr. 1103.)  Dr. Bergsten's initial treatment plan included obesity, hypertension, depression/anxiety, prediabetes, and hypothyroidism.  (Tr. 1105.)  Dr. Bergsten saw Mr. O'Hara monthly over the next seven months for follow up on Mr. O'Hara's extreme/morbid obesity, bariatric pre-op, chest pain, depression, shortness of breath, sleep apnea, lesions on his arm, polyuria, and prediabetes.  (Tr. 1089-91, 1091-93, 1093-95, 1095-97, 1097-99, 1099-1102.)

---

[6] Mr. O'Hara testified that his healthcare providers at UNMH would change based on when a doctor finished his or her residency.  (Tr. 81.)

[7] A house officer is a resident physician and surgeon of a hospital (the "house") who is receiving further training, usually in a medical or surgical specialty, while caring for patients under the direction of an attending physician. http://www.medicinenet.com/script/main/art.asp?articlekey=25449.

[8] Dr. Stuart Lisle provided primary medical care to Mr. O'Hara at UNMH's Family and Community Medicine from October 17, 2011 through May 19, 2014.  (Tr. 572-75, 577-81, 844-46, 847-50, 851-54, 855-57, 858-60, 861-63, 864-66, 1016-19, 1020-22, 1023-25,1106-07, 1107-09, 1109-11, 1111-13, 1114-15, 1115-17, 1117-19, 1119-21.)

[9] On July 17, 2014, Dr. Bellows performed an esophagogastroduodenoscopy to evaluate Mr. O'Hara's gastric anatomy and presence of any pathology as part of Mr. O'Hara's evaluation for bariatric surgery.  (Tr. 1190-91.)  On July 1, 2014, Dr. Hai performed an electrocardiogram to evaluate Mr. O'Hara's cardiovascular health for bariatric surgery.  (Tr. 1087-89.)  On July 31, 2014, Dr. Hai followed up with Mr. O'Hara regarding cardiac tests performed. (Tr. 1085-87.)  Dr. Hai noted that Mr. O'Hara's cardiology issues were cleared with various cardiac tests and that he could proceed with bariatric surgery.  (Tr. 1086.)

On February 10, 2015, Dr. Bergsten completed on Mr. O'Hara's behalf a Physical and Non-Physical Medical Assessment of Ability To Do Work-Related Activities.  (Tr. 1248-49.) Dr. Bergsten represented he considered Mr. O'Hara's medical history from 2013 to the current examination in preparing his assessments.  (*Id*.)  Dr. Bergsten stated that morbid obesity limited Mr. O'Hara's physical abilities and assessed that Mr. O'Hara could lift and/or carry less than twenty pounds; that he could stand and/or walk at least 2 hours in an 8-hour workday; that he must periodically alternate between sitting and standing to relieve his pain or discomfort; that he had limited ability to reach in all directions; and that he could occasionally kneel, stoop, and crawl, but should never crawl.  (*Id*.)  Dr. Bergsten also assessed that Mr. O'Hara's morbid obesity impacted his non-physical abilities and that he had *marked* limitations in his ability to maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently; and that he had *moderate* limitations in his ability to sustain an ordinary routine without special supervision or complete a normal workday and workweek without interruptions from pain or fatigue based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods.  (Tr. 1249.)

### B.    Treating Physician Inquiry

An ALJ is required to conduct a two-part inquiry with regard to treating physicians, each step of which is analytically distinct.  *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must decide whether a treating doctor's opinion commands controlling weight. *Krauser*, 638 F.3d at 1330.  A treating doctor's opinion must be accorded controlling weight "if it is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record."  *Id.* (citing *Watkins v. Barnhart*,

350 F.3d 1297, 1300 (10th Cir. 2003) (applying SSR 96-2p, 1996 WL 374188, at *2[10]).  If a treating doctor's opinion does not meet this standard, the opinion is still entitled to deference to some extent as determined under the second step of the process.  *Krauser*, 638 F.3d at 1330.  In this second step, the ALJ must determine the weight to accord the treating physician by analyzing the treating doctor's opinion against the several factors provided in 20 C.F.R. § 416.927(c).[11]  *Id.*  The ALJ is not required to "apply expressly" every relevant factor.  *Oldham*, 509 F.3d at 1258.  "Under the regulations, the agency rulings, and our case law, an ALJ must give good reasons . . . for the weight assigned to a treating physician's opinion," that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight."  *Langley*, 373 F.3d at 1119 (quoting *Watkins*, 350 F.3d at 1300).  Finally, if the ALJ rejects the opinion completely, he *must* then give "'specific, legitimate reasons'" for doing so.  *Watkins*, 350 F.3d at 1301 (citing *Miller v. Chater*, 99 F.3d 972, 976 (10th Cir. 1996) (quoting *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987)).  "In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion*."  *Langley*, 373 F.3d at 1121 (quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (emphasis in original)).

---

[10] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes.  *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35*; see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

[11] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist.  *See* 20 C.F.R. § 416.927(c)(2)-(6).

Here, the ALJ adopted, at least in part, Dr. Bergsten's assessment in determining Mr. O'Hara's exertional RFC.  In her determination, the ALJ briefly summarized Dr. Bergsten's assessments of Mr. O'Hara's ability to do work related physical and non-physical activities. (Tr. 21.)  The ALJ then stated she gave his opinion moderate weight because it was procured by Mr. O'Hara's attorney one day prior to the hearing and "due to its cursory, haphazard nature." (Tr. 21.)  The ALJ went on to explain that

> [i]t is unclear that Bergsten did anything more than observe the claimant's body habitus, which is not a permissible factor in determining residual functional capacity (see SSR 96-8p), and his failure to check the intended box on page one indicates a hurried report.  The extent of his relationship with the claimant is unclear, and his specialization is not listed.

> That said, Dr. Bergsten's assessment is not outrageous when considering the remainder of the record and the extreme obesity at issue.  *Therefore, I find the claimant capable of sedentary work where no kneeling, crouching or crawling is required.*  Where imaging of the back and knees revealed nothing significant, a sit/stand option is not justified.  Also, the claimant's weight-related issues are partially self-inflicted and susceptible to improvement through behavioral changes.  Despite constant admonitions from doctors throughout the record to curb his portion size, he continues to overeat (Ex. 9F/14).

(Tr. 20-21.)  (Emphasis added.)

The ALJ's evaluation of Dr. Bergsten's opinion fails for several reasons.  As an initial matter, the Court will not presume the ALJ applied the correct legal standard in considering Dr. Bergsten's opinion in the absence of necessary findings.  *Watkins*, 350 F.3d at 1301.  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only see the claimant's medical records."  *Doyal v. Barnhart,* 331 F.3d 758, 762 (10th Cir. 2003) (internal citations omitted).  "Our case law, the applicable regulations, and the Commissioner's pertinent Social Security Ruling (SSR) all make clear that in evaluating the

medical opinions of a claimant's treating physician, the ALJ must complete a sequential two-step inquiry, each step of which is analytically distinct." *Krauser*, 638 F.3d at 1330.   Here, the Court is not convinced the ALJ appreciated that Dr. Bergsten was Mr. O'Hara's treating physician because she stated in her explanation that she was unclear about the extent of Dr. Bergsten's relationship with Mr. O'Hara, unclear about his specialization, and unclear whether Dr. Bergsten did anything more than observe the claimant's body habitus.  (Tr. 21.)  Additionally, the ALJ only discussed the functional assessments Dr. Bergsten prepared and failed to reference any of Dr. Bergsten's treatment notes contained in the Administrative Record.  For these reasons, the context in which the ALJ evaluated Dr. Bergsten's opinion is more akin to that of a consultative examiner's opinion, as opposed to one prepared by a treating physician, the legal standard of review for which is markedly different.   That said, assuming *arguendo* the ALJ evaluated Dr. Bergsten's opinion as a treating physician, she nonetheless failed to apply the correct legal standards.  This is reversible error and requires remand.

### 1.   Step One Inquiry

The ALJ failed to consider the controlling-weight question at step-one.  At the first step of the treating physician inquiry, an ALJ must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.   If the answer to this question is "no," then the inquiry at this stage is complete.  *Watkins*, 350 F.3d at 1300.  If the ALJ finds that the opinion is well-supported, she must then confirm that the opinion is consistent with other substantial evidence.  *Id.*    The ALJ failed to expressly address either of these questions.

The Commissioner concedes the ALJ failed to consider the controlling weight question at step one, but contends it was harmless error because the ALJ assigned Dr. Bergsten's opinion

moderate weight thereby implicitly finding that Dr. Bergsten's opinion was not well supported by medically-acceptable clinical and laboratory diagnostic techniques and was inconsistent with other substantial evidence in the record.  (Doc. 20 at 11.)  The Commissioner also attempts to supplement the ALJ's findings by pointing to two State agency nonexamining medical consultants who opined that Mr. O'Hara could perform medium exertion work in contrast to Dr. Bergsten's assessment.  (*Id.*)  The Commissioner's argument fails at the outset because it contradicts the ALJ's ultimate determination that "Dr. Bergsten's assessment [was] not outrageous when considering the remainder of the record and the extreme obesity at issue," which on its face suggests the ALJ found that Dr. Bergsten's opinion was to some extent supported by and not inconsistent with other substantial evidence in the record.  (Tr. 21.)  Moreover, the ALJ clearly relied on some parts of Dr. Bergsten's opinion in determining Mr. O'Hara's exertional RFC; *i.e.,* "[t]herefore, I find the claimant capable of sedentary work where no kneeling, crouching or crawling is required."  (Tr. 18.)  The Commissioner's argument also fails because even if the Court were to agree that the State agency nonexamining medical consultant opinions could render Dr. Bergsten's opinion inconsistent with other substantial evidence in the record, affirming this post hoc effort would require the Court to overstep its institutional role and usurp essential functions committed in the first instance to the administrative process.  *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004.)  It is the ALJ's responsibility to evaluate, weigh, and adopt *or reject* State agency nonexamining medical opinions.  *See* 20 C.F.R. § 416.927(e)(2)(i); POMS DI 24510.001.A.2.b. (an ALJ is not bound by any findings or RFC assessments made by State agency medical consultants).  None of this analysis is contained in the ALJ's determination.  An ALJ's decision must be evaluated solely on the reasons stated in the decision, and the Court will not adopt the Commissioner's post-hoc

efforts to salvage the ALJ's failure to properly conduct the step one inquiry. *Robinson*, 366 F.3d at 1084.

The Court is not persuaded that the ALJ's error at step one is harmless. The Court finds harmless error only when it can "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Allen*, 357 F.3d at 1145. Here, the ALJ adopted parts of Dr. Bergsten's opinion in determining Mr. O'Hara's exertional RFC thereby demonstrating she thought it was well supported and not inconsistent with other substantial evidence in the record to some extent. Further, as discussed below, the ALJ's explanations for discounting Dr. Bergsten's opinion are inadequate. For these reasons, the Court cannot confidently say that no reasonable administrative factfinder could have resolved the factual matter in any other way had the correct step one analysis been followed.

## 2.   Step Two Inquiry

The second part of the ALJ's analysis also fails for several reasons. The second part of the required treating physician inquiry is governed by its own set of factors.[12] In applying these factors, the ALJ must give good reasons that are sufficiently specific to make clear to any subsequent reviewers the weight she gave to the treating source's medical opinion. *Krauser*, 638 F.3d at 1331; *Langley*, 373 F.3d at 1119. Here, the ALJ failed to demonstrate that she considered any of the other regulatory factors in weighing Dr. Bergsten's opinion, such as the fact of examination, the length of treatment relationship and frequency of examination, the nature and extent of the treatment relationship, consistency, and Dr. Bergsten's area of specialization. *See* 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). Instead, the ALJ discounted Dr. Bergsten's opinion stating (1) it was procured by the claimant's attorney one day prior to the hearing and was prepared in a "cursory, haphazard nature"; (2) it was unclear that

---

[12] *See* fn. 12, *supra*.

Dr. Bergsten did anything more than observe the claimant's body habitus; (3) the extent of Dr. Bergsten's relationship was unclear and his specialization was not listed; (4) the imaging of Mr. O'Hara's back and knees revealed nothing to justify a sit/stand option; and (5) that Mr. O'Hara's weight-related issues were partially self-inflicted and were susceptible to improvement through behavioral changes.  (Tr. 21.)  The Court will address each explanation in turn.

### a.    The ALJ's Explanations Are Inadequate

The ALJ discounted Dr. Bergsten's opinion by first explaining it was "procured by the claimant's attorney one day prior to the hearing and was prepared in a 'cursory, haphazard nature.'"  However, there is no evidence in the record to support that Mr. O'Hara's attorney influenced Dr. Bergsten's opinion or that Dr. Bergsten's assessments, even if prepared quickly, were unreliable solely on that basis.   As such, the ALJ's explanation for discounting Dr. Bergsten's opinion is based on pure speculation and an improper basis on which to reject a treating physician's assessment.  *See Langley,* 373 F.3d at 1121 (rejecting as speculative the ALJ's conclusion that a medical report was simply an act of courtesy to a patient).   More significantly, however, because there was an apparent conflict in Dr. Bergsten's assessments,[13] whether the result of Dr. Bergsten's being rushed or otherwise, the ALJ was required to recontact Dr. Bergsten for clarification before discounting or rejecting his opinion.  The ALJ failed to do so.  *See* 20 C.F.R. § 416.012(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to

---

[13] The ALJ explained that Dr. Bergsten indicated on one assessment form that Mr. O'Hara, *despite some fatigue,* could maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently, while indicating on the other assessment form that Mr. O'Hara had marked limitations in his ability to maintain physical effort for long periods without a need to decrease activity or pact, or to rest intermittently.  (Tr. 21.)

be based on medically acceptable clinical and laboratory diagnostic techniques."); *see also Robinson*, 366 F.3d at 1084 ("If the evidence from a claimant's treating doctor is inadequate to determine if the claimant is disabled, an ALJ is required to recontact a medical source, including a treating physician, to determine if additional needed information is readily available.").  For these reasons, the ALJ's first explanation for the weight to accorded Dr. Bergsten's opinion is inadequate because it is based on speculation and the ALJ erred by failing to recontact Dr. Bergsten to clarify the apparent conflict in his assessments.

The ALJ next explained that "it was unclear that Bergsten did anything more than observe the claimant's body habitus, which is not a permissible factor in determining residual functional capacity (see SSR 96-8p)[.]"  First, the ALJ's explanation is not supported by substantial evidence because Dr. Bergsten was Mr. O'Hara's treating physician at UNMH's Department of Family and Community Medicine for a period of at least seven months. (Tr. 1089-91, 1091-93, 1093-95, 1095-97, 1097-99, 1099-1102, 1102-1106.)  Dr. Bergsten's treatment notes indicated he physically examined Mr. O'Hara monthly, and provided regular treatment and follow up for Mr. O'Hara's extreme/morbid obesity, bariatric pre-op, chest pain, depression, shortness of breath, sleep apnea, lesions on his arm, polyuria, and prediabetes.  (*Id.*) Thus, the record supports that Dr. Bergsten did far more than merely observe Mr. O'Hara's body habitus.  Second, the ALJ's explanation is completely misplaced because Mr. O'Hara was *morbidly obese* and Dr. Bergsten specifically stated that the basis for assessing Mr. O'Hara's limitations for doing work-related physical and non-physical activities was *morbid obesity*.  (Tr. 1248-49.)  Social Security Ruling 02-1p provides guidance and instructions on how an ALJ *must* consider obesity in the RFC assessment even though SSR 96-8p says, "[a]ge and body habitus are not factors in assessing RFC."  *See* SSR 02-1p, 2002 WL 34686281, at *7 ("How Can We

Consider Obesity in the Assessment of RFC When SSR 96-8p says, 'Age and Body Habitus Are not Factors in Assessing RFC'"?).  The ruling specifically instructs that the ALJ must distinguish between individuals who have a medically determinable impairment of obesity and individuals who do not.  *Id.*  "When we identify obesity as a medically determinable impairment . . . , we will consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments that we identify."  *Id.*  The Social Security Ruling further instructs that

> [o]besity can cause limitation of function.  The functions likely to be limited depend on many factors, including where the excess weight is carried.  An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching.  The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers.  The ability to tolerate extreme heat, humidity, or hazards may also be affected.

> The effects of obesity may not be obvious.  For example, some people with obesity also have sleep apnea.  This can lead to drowsiness and lack of mental clarity during the day.  Obesity may also affect an individual's social functioning.

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.  Individuals with obesity may have problems with the ability to sustain a function over time.  As explained in SSR 96-8p . . . , our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.  In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity.  This may be particularly true in cases involving sleep apnea.

> The combined effects of obesity with other impairments may be greater than might be expected without obesity.  For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

> . . .

> As with any other impairment, we will explain how we reached our conclusions
> on whether obesity caused any physical or mental limitations.

SSR 02-1p, 2002 WL 34686281, at *6-7.  Here, the ALJ determined that Mr. O'Hara had a

medically determinable severe impairment of obesity.  (Tr. 16.)  The ALJ also determined that

Mr. O'Hara had, *inter alia*, non-severe impairments of sleep apnea and generalized joint pain.

(Tr. 16-17.)  As such, she was required to consider any functional limitations resulting from his

obesity, and the combined effect of his obesity with his other impairments.  SSR 02-1p, 2002

WL 34686281, at *6-7.  The ALJ's explanation is silent regarding any of these considerations.

For these reasons, the ALJ's second explanation for discounting Dr. Bergsten's opinion is

inadequate because it is not based on substantial evidence and she failed to consider

Mr. O'Hara's functional limitations resulting from his obesity and the combined effect of his

obesity with his other impairments pursuant to SSR 02-1p.

Third, the ALJ explained that she was unclear about the extent of Dr. Bergsten's

relationship with Mr. O'Hara and that his specialization was not listed.  (Tr. 21.)  As previously

stated, the record supports that Dr. Bergsten was Mr. O'Hara's treating physician at UNMH's

Department of Family and Community Medicine for a period of at least seven months and that

he practiced in family medicine.  (Tr. 1089-91, 1091-93, 1093-95, 1095-97, 1097-99, 1099-1102,

1102-1106.)  This information was readily available in the Administrative Record.  Further,

Mr. O'Hara testified that Dr. Bergsten was a resident at UNM and that he had been seeing him

for a little over a year.  (Tr. 81.)  For these reasons, the ALJ's third explanation for discounting

Dr. Bergsten's opinion is inadequate because it is not based on substantial evidence.

Fourth, the ALJ rejected Dr. Bergsten's assessment that Mr. O'Hara must periodically

alternate sitting and standing to relieve pain or discomfort explaining that this limitation was not

justified because imaging of Mr. O'Hara's back and knees revealed nothing significant.  The

ALJ's explanation in inadequate because she failed to consider the combined effect of Mr. O'Hara's obesity with his generalized joint pain, as she as required to do, and that Mr. O'Hara's obesity and generalized joint pain may cause more pain and limitation than might be expected from the generalized joint pain alone. SSR 02-1p, 2002 WL 34686281, at *6. This is error. For this reason, the ALJ's fourth explanation for discounting Dr. Bergsten's opinion is inadequate because she failed to consider Mr. O'Hara's generalized joint pain in combination with his obesity pursuant to SSR 02-1p.

Fifth, the ALJ discounted Dr. Bergsten's opinion because "the claimant's weight-related issues [were] partially self-inflicted and susceptible for improvement through behavioral changes." (Tr. 21.) This explanation flies in the face of the Administration's own ruling that defines obesity as a "complex, chronic disease characterized by excessive accumulation of body fat. Obesity is generally the result of a combination of factors (*e.g.,* genetic, environmental, and behavioral)." SSR 02-1p, 2002 WL 34686281, at *2. The ruling further explains that "[o]besity is a life-long disease" and that "most treatments for obesity do not have a high rate of success." *Id.* at *8-9. The ruling also discusses that behavior modification is the usual treatment for levels I and II obesity (BMI 30.0-39.9), but when obesity has reached level III (BMI of 40 or great), physicians generally recommend surgery. *Id.* at 8. Here, the record supports that Mr. O'Hara suffered with obesity for years. *See* Section IV.A, *supra*. On December 5, 2014, Dr. Bergsten noted that Mr. O'Hara had a BMI of 51.85, and noted elsewhere that he was being evaluated for bariatric surgery due to the severe nature of his obesity. (Tr. 1092, 1102.) Thus, the ALJ's conclusory inference that if only Mr. O'Hara were to "curb his portion size" (Tr. 21) his morbid obesity would improve is completely misinformed. For these reasons, the ALJ's fifth

explanation for discounting Dr. Bergsten's opinion is inadequate because it is not based on substantial evidence and the ALJ failed to consider Mr. O'Hara's obesity pursuant to SSR 02-1p.

**b.**    **The ALJ Failed To Address Certain Physical and Non-Physical Limitations**

Finally, Mr. O'Hara argues that the ALJ either inadequately addressed or completely failed to address certain of Dr. Bergsten's assessed physical and non-physical limitations. (Doc. 16 at 19-20, 23-25.)   As to his physical limitations, Mr. O'Hara argues that the ALJ rejected Dr. Bergsten's assessment that he was limited in his ability to reach in all directions without specifying her reasons for doing so.  (Doc. 16 at 19-20.)  The Commissioner argues that the ALJ's reasons for according moderate weight to Dr. Bergsten's opinion supported the omission of reaching limitations from the RFC.   (Doc. 20 as 12.)   The Court has already determined that the ALJ's explanations for according moderate weight to Dr. Bergsten's opinion are not based on substantial evidence and are riddled with errors.  That aside, the ALJ fully relied on certain of Dr. Bergsten's limitations when she determined Mr. O'Hara's exertional RFC. Further, she did not state that any evidence conflicted with Dr. Bergsten's assessment regarding Mr. O'Hara's limited ability to reach in all directions.[14]   Instead, she simply left it out of her exertional RFC determination without an adequate explanation.  This is error.  *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability.").

---

[14] The Commissioner argues that there was no support in the medical records for a reaching limitation.  (Doc. 20 at 13.)  However, this amounts to post hoc argument because the ALJ did not state this as a reason for rejecting this finding.  *Robinson*, 366 F.3d at 1084.  The Commissioner also argues that the jobs the ALJ relied on at step five required only frequent, as opposed to constant, reaching, and that Mr. O'Hara could arguably perform those jobs with some limitation in his reaching ability.  (*Id.*)  However, absent clarification from Dr. Bergsten regarding the extent of Mr. O'Hara's reaching limitation, the Commissioner's argument is based on speculation.

As to Mr. O'Hara's non-physical limitations, Mr. O'Hara makes two arguments.  First, he argues that the ALJ improperly rejected Dr. Bergsten's assessment that he had *marked* limitations in his ability to maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently, based on the apparent conflict in Dr. Bergsten's assessments.[15]  (Doc. 16 at 23-25.)  Mr. O'Hara further asserts that the conflict triggered the ALJ's duty to seek clarification.[16]  (*Id.*)  Second, Mr. O'Hara argues that the ALJ failed to supply any reasons at all for rejecting Dr. Bergsten's assessment that he had *moderate* limitations in his ability to sustain an ordinary routine without special supervision, and complete a normal workday and workweek without interruptions from pain or fatigue based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods.  (Doc. 16 at 23-25.)  Elsewhere in her determination, the ALJ considered the opinions of State agency examining psychological consultants Amy S. DeBernardi, Psy.D., and Paula Hughson, M.D. (Tr. 21-22.)  The ALJ accorded their opinions "great weight where their opinions overlap[ped]," and relied on their assessments to determine Mr. O'Hara's mental RFC, *i.e.,* that he could carry out simple and some detailed, but no complex tasks, and that he could have occasional, superficial interaction with co-workers but could not interact with the public.  (Tr. 18, 21-22.)  The ALJ's mental RFC clearly did not account for Dr. Bergsten's marked and moderate limitations, and the ALJ failed to provide any adequate explanations for discounting or rejecting his opinion in the absence of contradictory evidence.[17]  This is error.  An ALJ must provide a

---

[15] *See* fn. 14, *supra.*

[16] The Court previously addressed its agreement that the apparent conflict in Dr. Bergsten's assessments triggered the ALJ's duty to seek clarification.  *See* Section IV.B.2.a., *supra.*

[17] Dr. DeBernardi assessed, *inter alia*, that Mr. O'Hara's "symptoms of depression, anxiety, and symptoms related to past trauma might interfere with his ability to be a dependable employee[.]" (Tr. 838.)  Dr. Hughson completed a Statement of Opinion of Abilities (Psychiatric Only) form and assessed, *inter alia*, that Mr. O'Hara had mild to moderate limitations in his ability to work without supervision.  (Tr. 1012.)  The Court notes that the form

legally sufficient explanation for rejecting a treating physician's opinion in favor of an examining and/or nonexamining physician. *Robinson*, 366 F.3d at 10841078, 1084 (10th Cir. 2004). Moreover, the ALJ was required to consider Mr. O'Hara's obesity in assessing Mr. O'Hara's mental RFC. Here, the ALJ determined Mr. O'Hara had a severe impairment of obesity and a non-severe impairment of sleep apnea. (Tr. 16.) Additionally, Dr. Bergsten indicated that Mr. O'Hara suffered from fatigue as a result of his morbid obesity, and that he had to rest or lie down at regular intervals because of his pain and/or fatigue. (Tr. 1249.) SSR 02-1 explains that "as with any other impairment, we will explain how we reached our conclusions on whether obesity caused any . . . mental limitations." SSR 02-1p, 2002 WL 34686281, *6. The ruling further explains that "[s]ome people with obesity [] have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day." *Id.* "In cases involving obesity, fatigue may affect the individual's . . . mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea." *Id.* For these reasons, an RFC assessment should be made of the effect obesity has on a claimant's maximum remaining ability to do sustained work activity on a regular and continuing basis; *i.e.*, 8 hours a day, for 5 days a week. *Id.* There is no evidence that the ALJ considered the effect of Mr. O'Hara's obesity on his mental ability to sustain work activity on a regular and continuing basis.[18] This is error.

For the foregoing reasons, the Court finds the ALJ did not apply the correct legal standards in evaluating the opinion of Mr. O'Hara's treating physician. *Krauser*, 638 F.3d at 1330. This is reversible error. *Robinson*, 366 F.3d at 1085; *Jensen*, 436 F.3d at 1165 ("[t]he

---

Dr. Hughson completed did not present questions of whether Mr. O'Hara had any limitations affecting his ability to sustain an ordinary routine without special supervision or had limitations in his ability to complete a normal workday and workweek without interruptions from pain or fatigue based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods. (Tr. 1012.)

[18] Similarly, neither Dr. DeBernardi nor Dr. Hughson addressed the effect of Mr. O'Hara's obesity on his ability to sustain work activity on a regular and continuing basis.

failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.").

### C.   <u>Substantial Justification</u>

The Commissioner bears the burden of proving that its position was substantially justified.   *Kemp v. Bowen*, 822 F.3d 966, 967 (10th Cir. 1987).   The test for substantial justification is one of reasonableness in law and fact.   *Gilbert v. Shalala*, 45 F.3d 1391, 1394 (10th Cir. 1995).   The government's position must be "justified in substance or in the main – that is, justified to a degree that could satisfy a reasonable person."   *Pierce v. Underwood*, 487 US. 552, 565, 108 S. Ct. 2541, 101 L.Ed.2d 490 (1988).   The government's "position can be justified even though it is not correct."   *Hackett*, 475 F.3d at 1172 (quoting *Pierce*, 487 U.S. at 565.)   A lack of substantial evidence on the merits does not necessarily mean that the government's position was not substantially justified.   *Hadden v. Bowen*, 851 F.2d 1266, 1269 (10th Cir. 1988).

As fully discussed herein, the ALJ failed to apply the correct legal standards in evaluating the opinion of Mr. O'Hara's treating physician.   Further, her explanations for according moderate weight to his opinion were not based on substantial evidence and riddled with errors. Therefore, the government's position was not substantially justified.

### D.   <u>Remaining Issues</u>

The Court will not address Mr. O'Hara's remaining claim of error because it may be affected by the ALJ's treatment of this case on remand.   *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## V.  Conclusion

For the reasons stated above, Mr. O'Hara's Motion to Reverse or Remand for Rehearing

is **GRANTED.**

_____
**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**